ON APPLICATION FOR REHEARING
This court's opinion of December 19, 1995, is withdrawn, and the following opinion is substituted therefor:
The petitioner, the State of Alabama, through the attorney general's office, filed this petition for a writ of mandamus asking us to direct the Honorable Steven E. Haddock, circuit judge for the eighth judicial circuit, to vacate the judgment of acquittal entered by Judge Rudolph Slate, now retired, in favor of Kenneth and Jenny Grantland.[1] The Grantlands were charged with murder in recklessly causing the death of their son, a three-month-old infant, by depriving him of food. See §13A-6-2(a)(2), Ala. Code 1975. On February 3, 1993, the jury returned verdicts finding the Grantlands guilty of the lesser included offense of reckless manslaughter. See § 13A-6-3, Ala. Code 1975.[2] At sentencing on January 9, 1995, the Grantlands' counsel filed a motion for a judgment of acquittal. After a hearing on the motion, Judge Slate granted the motion and entered a judgment of acquittal. The state filed a motion for reconsideration with Judge Haddock, to whom the case had been assigned after Judge Slate's retirement. Judge Haddock denied the motion. The state then filed this petition for a writ of mandamus attacking Judge Slate's ruling and requesting that this court direct Judge Haddock to set aside Judge Slate's judgment and reinstate the Grantlands' convictions for manslaughter. For the reasons set forth below, we grant the state's petition.
Although Rule 20.3, Ala.R.Crim.P., clearly authorizes a trial judge to grant a motion for a judgment of acquittal after the jury has returned a guilty verdict, that rule does not permit a judge to enter a judgment of acquittal on grounds other than those provided for under Rule 20 generally. A motion for a judgment of acquittal tests the legal sufficiency of the evidence. Suttles v. State, 574 So.2d 1012 (Ala.Cr.App. 1990);Metzger v. State, 565 So.2d 291 (Ala.Cr.App. 1990); see, generally, Committee Comments, Rule 20.1, Ala.R.Crim.P. When presented with a challenge to the sufficiency of the evidence, the trial court, and any reviewing court, must accept the evidence presented by the state as true, must view that evidence in a light most favorable to the state, and must accord the state all legitimate inferences from the evidence.Rowe v. State, 662 So.2d 1227 (Ala.Cr.App. 1995). Where there is legal evidence from which a jury could by fair inference find a defendant guilty, a trial judge should submit *Page 1312 
the case to the jury. Id. Moreover, where there is sufficient legal evidence to submit the case to the jury and the jury has considered that evidence and rendered its verdict, it is not proper for the trial court, or a reviewing court, to substitute its judgment for that of the jury. Winters v. State,673 So.2d 786 (Ala.Cr.App. 1995); Rowe, 662 So.2d 1227. It is not the function of the court to assess the credibility of witnesses, weigh the evidence, or substitute its judgment as to guilt or innocence for that of the jury. Porter v. State, 666 So.2d 106
(Ala.Cr.App. 1995).
We turn to the state's evidence in this piteous case. The evidence against the Grantlands is compelling. The record reflects that on January 23, 1990, members of the Priceville Police Department investigated the death of an infant, three-month-old Kenny Grantland. A police officer dispatched to the Grantlands' residence found the child dead in his crib. Photographs introduced into evidence at trial revealed that the child was drastically emaciated. His ribs and his skull were clearly visible through his skin. The crib beneath his head was stained with dirt. Several sores were evident on his face and neck, and there was a pressure sore on the back of his head. When police removed the child's clothing, a live roach was found inside. A forensic pathologist testified that the child had died of malnutrition, specifically from starvation and dehydration. The pathologist stated that the sores on the child's face were caused by the malnutrition. The pathologist also testified that the pressure sore on the back of the child's head was caused by prolonged contact with the crib mattress. The pathologist stated that the child's face appeared pinched and wrinkled because there was no fatty tissue under the skin. The autopsy revealed that there was no fat stored around any of the child's internal organs and that his lungs had partially collapsed from dehydration.
Evidence indicated that the child weighed approximately 6 pounds and 11 ounces when he was born on October 22, 1989. The pediatrician who examined the child shortly after his birth testified that this was a normal birth weight and that the child had no apparent health problems when he left the hospital. Testimony indicated that when the child visited the hospital emergency room on December 14 and 15, 1989, for a minor illness, diagnosed as virile gastroenteritis, he weighed 8 pounds and 12 ounces, which, medical testimony indicated, was a normal weight for a child of his age and birth weight. There was no evidence suggesting that there were any obvious sores on the child's body at the time of his December 14 and 15, 1989, visits to the hospital. At the time of the child's death, approximately five weeks after these hospital visits, he weighed six pounds and six and one-half ounces, less than he weighed at birth. A forensic pathologist testified that a normal weight for child of the same age as the victim was approximately 12 pounds. Based on the difference between the child's weight at death and the normal weight for a child that age, the pathologist calculated that at the time of death, the child had a caloric deficit equal to having gone 12.8 days without food. The evidence reflected that the child's drastic weight loss and the other obvious changes in his physical condition must necessarily have occurred during the five-week period between December 15, 1989, and January 23, 1990. Evidence indicated that the child was in the care of his parents during this period and that during this period, his parents did not seek medical attention for him. The Grantlands had three other children. There was no evidence that the Grantlands were unaware of the commonly known fact that human beings deprived of food will starve to death. The Grantlands claimed not to have noticed the child's dramatic weight loss and claimed not to have noticed that the child was especially ill before his death, despite the child's obviously emaciated appearance.
"A person commits the crime of manslaughter if he recklessly causes the death of another." Washington v. State,608 So.2d 771, 772 (Ala.Cr.App. 1992); § 13A-6-3(a)(1), Ala. Code 1975. Section 13A-2-2(3), Ala. Code 1975, provides:
 "A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result *Page 1313 
will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation."
If the trial court had denied the Grantlands' motion for a judgment of acquittal and the Grantlands had then challenged the sufficiency of the evidence on direct appeal to this court, we would surely have held that there was sufficient evidence of manslaughter to submit the case to the jury. SeeWashington, 608 So.2d 771.
We recognize that under current Alabama law, the state is not afforded the same statutory right as a criminal defendant to appeal a trial court's ruling on a motion for a judgment of acquittal and that, therefore, the state must seek redress in such situations through a petition for a writ of mandamus. We further recognize the limited application of mandamus. "Mandamus lies when no other adequate remedy is available."Ex parte Taylor Coal Co., 401 So.2d 1, 3 (Ala. 1981). Mandamus is an extraordinary remedy; it is not a substitute for appeal; it will not lie to compel a trial court to exercise its discretion in a particular manner; and it does not lie to review the ruling of a trial court on the ground that it was erroneous. State v. Cannon, 369 So.2d 32, 33 (Ala. 1979).[3] SeeEx parte Spears, 621 So.2d 1255 (Ala. 1993). In Ex parte Nice,407 So.2d 874 (Ala. 1981), however, the Alabama Supreme Court recognized that exceptional circumstances may arise in a criminal case that present a compelling need for the issuance of a writ of mandamus to countermand a judicial usurpation of power and to prevent a gross disruption in the administration of criminal justice. In Nice, the Alabama Supreme Court upheld this court's issuance of a writ of mandamus directing the trial court to rescind its order granting the defendant's motion for a new trial and to reinstate the jury's guilty verdict where it was apparent from the record that, although there was sufficient legal evidence to submit the case to the jury, the trial court had granted the defendant's motion for a new trial based on the trial judge's personal belief that the victim's testimony was "dubious." Nice, 407 So.2d at 879. Because it was apparent that the trial judge had not based its grant of the new trial motion upon a finding that the state had failed to prove its case as a matter of law, but rather that he had assumed the role of a "thirteenth juror," who would have reached a different decision from the one reached by the other 12 jurors, Nice, 407 So.2d at 881-82, the Supreme Court found that the trial judge had exceeded his authority. Accordingly, the Supreme Court held that it was appropriate to direct the trial judge to set aside his grant of the defendant's motion for a new trial and to reinstate the jury's verdict of guilt. The Supreme Court concluded that it was "unimportant" that the state had sought review of the trial judge's ruling through mandamus, its only available remedy under the circumstances, and not by direct appeal, which is a remedy available to the Federal Government in such cases, because the record established that the trial judge was "guilty of a 'usurpation of power,' as these terms are used in determining *Page 1314 
the propriety of a grant of mandamus." Nice, 407 So.2d at 879.
Upon reading the statements made by Judge Slate when he granted the Grantlands' motion for a judgment of acquittal, and after considering the circumstances surrounding the granting of that motion, we are convinced that Judge Slate could have reached his decision only by substituting his personal judgment and "his own subjective interpretation of the evidence,"Burns, supra, 597 F.2d at 944, for that of the jury. Judge Slate had no authority to do this, and his doing so amounted to a "usurpation of power." Nice, 407 So.2d at 879.
Following the hearing on the motion for a judgment of acquittal, Judge Slate made the following statements:
 "Let me say that this is a very tragic case from both sides of the Court. And I will say further that it is the responsibility of the State to present cases where it believes a criminal act has been committed, to present that evidence to a Grand Jury, and it is the responsibility of the Grand Jury to reach — Bring an indictment if it finds probable cause to believe that such an act has been committed. And it is the responsibility of the State to prosecute that case, to present evidence that the State has available to it of that criminal conduct or activity to the Court, which would include a jury or to a Judge, sitting without a jury. It is the responsibility of the defense to present any evidence that the defense has in favor of the Defendant. To present every legal defense available to the Defendant. That's the responsibility of the defense. And after the State has presented its evidence and the defense has presented its defense, then it is the responsibility of the Court, sitting with or without a jury to render a just, fair and proper verdict based upon the evidence in the case and upon the law that applies to the case.
 "In this case I ruled that the charge of murder was not an appropriate charge based upon some prior case rulings, and so the case went to the jury on the charge of manslaughter, and as Mr. Lavender or Mr. Madison [attorneys for the Grantlands], one or the other said, the defense had a trial tactic as part of its trial strategy, requested no lesser included offense or no lesser included offenses be given to the jury, and the Court did not give any lesser included offenses of manslaughter to the jury. The jury, after deliberation, brought these verdicts of manslaughter — guilty of manslaughter in each of these two cases, whereupon the Court adjudged the Defendants guilty of manslaughter.
 "The case has been drug out for — That's a terrible term — The case has been delayed for two years, largely because of me. Mainly because of me. I have had a lot of problems physically, but that's no excuse. I could have done it earlier. I did consider professional sentence planning, and I'm not sure you could have gotten that earlier if I had insisted upon it. The case has been delayed primarily because I didn't know what to do with the case. This case has caused me more bother, more concern, more loss of sleep, and more thinking than any case that I have ever tried or disposed of, in this case, in 18 years.
 "I have disposed of in a period of 10 years, more than 9,000 felony cases. I have tried more than 400 felony cases, including capital murder cases. None of those cases, not one of them, have given me as many problems trying to decide what to do with the case, as this case has given me. Even as I walked into the courtroom I was not sure what I would do in this case, but I know that it is time to make a decision in this case.
 "In all of those cases that I have decided, criminal, domestic, traffic, civil and otherwise, I do not look back on any one of those decisions with the thought that, 'I made a mistake. I shouldn't have decided that case like I did.' That is certainly not to say that each of those cases were — each of those decisions were the best decisions or the right and proper decisions to be made. I don't contend that. I do say that when I made those decisions, I believed that they were the right, proper, correct, fair, just, and legal decisions, and I still believe that. None of those cases have come back to me, nothing has happened in *Page 1315 
any of those cases to cause me to believe otherwise.
 "I want to do the same thing in this case. I have to live with whatever I decide in this case, as I have in all of those other cases. And I plan to make a decision that I can live with and I believe that that will be the fair, right, and just decision, or I won't make it.
 "I have studied these sentence reports from each case. I have thought about this case considerably, as I said. I would note that each of these parties, they are now divorced, and at least one of them may be remarried — I think maybe one is remarried — And has an additional child — Jenny — Since this case was tried. Neither have a criminal history. Neither. Mr. Grantland has two DUI charges or convictions, one of which was made after his first divorce, the second upon or after the death of this child in this case. I do not gather from the report exactly how far in school Jenny Grantland went. From the reading of the record I take that it was not very far in school, and that it was because of her capacity to learn the academic teachings of school. I believe that Mr. Grantland finished the ninth grade of school. I saw in Court on the day of the trial — On the week of trial other children that were in the home of those parties who appeared to be well nourished, well dressed, healthy, well mannered children. I observed these two parents during the course of this trial. There were people in and out of the home of these parties during the life of this child. The child was taken to a doctor on one or more occasions. I kind of wonder why some of these people who were in and out of this home or why the medical doctor didn't recognize the condition of this child. If it were recognizable.
 "The parties here are charged with consciously disregarding the condition of that child. Why did the medical professional — Why did the man trained medically and professionally not recognize the condition of this child? Why wasn't the Department of Pensions and Security not alerted to the condition of this child? It appears to me that the system failed this child. And probably these parents.
 "I place great weight on the verdicts of juries. I have never in 18 years to my knowledge set aside a jury verdict. To my recollection, I have not. I have never disagreed with a jury verdict. I have had jury verdicts that may have surprised me a little or I didn't know which way they would go, but I have never disagreed with a jury verdict of any case that I have tried.
 "This jury in this case was a good jury. This jury did what they believed they had to do. I do not hold anything — I do not hold this jury responsible nor do I accuse them of reaching a verdict that was not what they believed to be the proper verdict in this case. But I disagree with this verdict, and I do not believe that these Defendants are guilty of murder, and I have acquitted them of that already, based upon prior case law.
 "The offense of manslaughter is committed when a person recklessly causes the death of another person. Recklessly is defined in this Code. It means that the Defendant must cause death recklessly as that term is defined by the Code.
This means that the Defendant was aware of and consciously disregarded a substantial and unjustifiable risk that death would occur. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. The reckless offender is aware of the risk and consciously disregards it. That's what constitutes manslaughter, and that's what must occur before a person could be convicted of manslaughter.
 "I find in this case that the evidence does not support that charge. I am going to set aside the verdict of the jury. I am going to order an acquittal of the crime of manslaughter in this case. As to the charge of manslaughter, these Defendants are discharged. So ordered. We will be in recess."
Although Judge Slate, in the above-quoted statements, used some language suggesting that he was granting the motion for a judgment of acquittal on the ground that the *Page 1316 
evidence was insufficient to support the inference that the Grantlands had consciously disregarded a known risk, as required to prove reckless manslaughter, and Judge Slate's notations on the case action summary sheet reflect that he found that the "evidence in this case does not support the verdict," our review of the record and careful consideration of all the statements made by Judge Slate leads us to the firm conviction that Judge Slate actually granted the motion because he personally disagreed with the jury's verdicts and he chose to act, as the trial judge did in Nice, as a "thirteenth juror" to set aside the decision reached by the other 12 jurors. Although there is an obvious danger in reading between the lines of a trial court's judgment, this case calls out for the elevation of substance over form. In addition to plainly stating that he "disagreed" with the jury's verdicts when he granted the motion, Judge Slate also referred favorably to the Grantlands' lack of criminal histories, to his own observations of the Grantlands' demeanor at trial, and to his personal opinion that the Grantlands had provided their surviving children with a healthy environment. While such matters may have been suitable for consideration by the judge at sentencing, they have nothing to do with the sufficiency of the evidence as to guilt or innocence. In substance, Judge Slate nullified the jury's verdicts because he personally would have decided matters otherwise. As the Fifth Circuit Court of Appeals stated in United States v. Brown, 587 F.2d 187, 190-91
(5th Cir. 1979), "[O]nce the government's evidence has passed the test of legal sufficiency, a trial judge is without authority to enter a judgment of acquittal 'simply because he thinks that course would be most consistent with the interests of justice.' " (Citations omitted.) See Burns, 597 F.2d 939 (in granting defendants' post-verdict motion for a judgment of acquittal, the trial judge improperly substituted his own interpretation of the evidence for that of the jury by assessing the credibility of witnesses and the character of the defendants). A trial judge should not be allowed simply to recite the appropriate language related to questions of the sufficiency of the evidence as a magical incantation to free a legally convicted person and forever frustrate the state's attempts to seek redress.
We note that those of Judge Slate's statements that appear to address the state's evidence are bottomed on the court's mistaken belief that medical professionals examined the child on some occasion after December 15, 1989, or that by that date, the child had begun to show signs of serious illness or significant weight loss that could have been noticed by medical personnel. However, as we have noted above, the child was never examined by medical personnel after December 15, 1989, and on that date, he weighed 8 pounds and 12 ounces, a normal weight for a child of his age and birth weight. There was no evidence at that time of any obvious sores on the child's body. At the time of his death, approximately five weeks later, however, the child's weight had dropped to six pounds and six and one-half ounces, which was less than he weighed at birth. We would further note that the hearing on the Grantlands' motion for judgment of acquittal was held almost two years after the trial had concluded and the jury's guilty verdicts had been returned. Judge Slate apparently did not have a transcript of the trial proceedings before him when he ruled on the Grantlands' motion, and it is not inconceivable that remembrances concerning trial testimony had faded. Finally, although a trial judge is free to change his or her ruling on such matters, we note that while Judge Slate did grant the Grantlands' motion for a judgment of acquittal on the charge of murder at the close of the state's case, Judge Slate denied the Grantlands' motion for a judgment of acquittal on the manslaughter charges at that time. These factors, while not dispositive, reinforce our belief that Judge Slate's ruling on the Grantlands' post-verdict motion for a judgment of acquittal some two years after the verdicts were returned was based on matters outside the state's proof at trial.
We have made every effort here to resist expanding by judicial fiat the state's right of appeal in criminal cases and to avoid collapsing review by mandamus into review by appeal. Our review of the record, however, convinces us that the trial judge did not grant the Grantlands' motion on the basis of *Page 1317 
any authority legally conferred upon him. In effect, the trial judge acted "ultra vires." The state's petition for the writ of mandamus is due to be granted. Public policy requires that jury verdicts not be arbitrarily set aside.
The Grantlands argue that the state cannot seek to set aside the trial court's judgment in this case without running afoul of the double jeopardy clause. However, because issuance of the writ of mandamus requires only that the trial court reinstate the guilty verdicts of the trier of fact and does not entail a separate trial, double jeopardy is not implicated.Nice, 407 So.2d at 882; see United States v. Wilson,420 U.S. 332, 352-53, 95 S.Ct. 1013, 1026, 43 L.Ed.2d 232, 247 (1975);United States v. Cravero, 530 F.2d 666 (5th Cir. 1976).
Based on the foregoing, the state's petition for the writ of mandamus is hereby granted and the trial court is ordered to set aside its ruling granting the Grantlands' motion for a judgment of acquittal, and is hereby ordered to reinstate the jury's verdicts and to enter judgments of conviction against the Grantlands.
APPLICATION FOR REHEARING GRANTED; ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; PETITION GRANTED.
McMILLAN and COBB, JJ., concur.
TAYLOR, P.J., dissents.
PATTERSON, J., dissents with opinion.
[1] Judge Slate entered the judgment of acquittal. After Judge Slate's retirement, the case was assigned to Judge Haddock, who ruled on the motion for reconsideration.
[2] Section 13A-6-3, Ala. Code 1975, provides:
"(a) A person commits the crime of manslaughter if:
 "(1) He recklessly causes the death of another person. . . ."
[3] We note that in criminal cases in Federal court the government is specifically authorized by statute to appeal from judgments of acquittal entered after jury verdicts of conviction.18 U.S.C.A. § 3731. See, e.g., United States v. Burns,597 F.2d 939, 940 (5th Cir. 1979). In the Federal courts, the applicable standard for reviewing a ruling on a motion for a judgment of acquittal in such circumstances is the same, whether the appeal is by the government or by a defendant: the motion for a judgment of acquittal should be denied if "viewing the evidence presented most favorably to the Government, a reasonable-minded jury could accept the relevant and admissible evidence as [adequate] and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt." United States v.Brown, 587 F.2d 187, 190 (5th Cir. 1979). See also, UnitedStates. v. Barfield, 999 F.2d 1520, 1522 (11th Cir. 1993);United States v. Varkonyi, 611 F.2d 84, 86 (5th Cir. 1980), cert. denied, 446 U.S. 945, 100 S.Ct. 2173, 64 L.Ed.2d 801
(1980); Burns, 597 F.2d at 941. The trial court's ruling is accorded no deference. Obviously, therefore, the Government has a greater likelihood of prevailing on an appeal challenging a ruling on a motion for a judgment of acquittal in Federal court than the State of Alabama does when it seeks review of a trial court's judgment of acquittal, because the State of Alabama can attack a trial court's ruling in such circumstances only by way of a petition for a writ of mandamus, which is a limited form of review.